UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA ANN MISKO,

        Plaintiff,                        Case No. 16-cv-13360

v.                                       Paul D. Borman
                                       United States District Judge

SPEEDWAY, LLC,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT SPEEDWAY LLC'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 18)

This is a slip and fall case. Plaintiff alleges that she slipped on an icy patch in a gas station parking lot when stepping out of her car to enter the store of the station on the evening of February 12, 2015, injuring her ankle and suffering other related injuries. Defendant Speedway LLC[1] ("Speedway") now moves for summary judgment, arguing that Speedway did not cause the condition, did not have notice, actual or constructive, of the icy patch and, even if it did have notice, the condition of the parking lot surface was open and obvious. (ECF No. 18.) Plaintiff filed a

---

[1] Defendant stated in its Removal papers, and the Court confirmed with both parties at the February 22, 2018 hearing on Defendant's motion for summary judgment, that Plaintiff named the wrong party. The correct party Defendant is Speedway, LLC. The Clerk of the Court is directed to change the name on the docket.

Response (ECF No. 24) and Defendant replied (ECF No. 25). The Court held a hearing on February 22, 2018, and ordered supplemental briefing which the parties have submitted (ECF Nos. 27, 28.) For the reasons that follow, the Court GRANTS Defendant's motion.

## I.    FACTUAL BACKGROUND

On February 12, 2015, at approximately 9:30 p.m., Plaintiff was riding in the passenger seat of her husband's vehicle as he parked the car at the Speedway gas station at 300 West 6 Mile Road, Whitmore Lake, Michigan. (Def.'s Mot. Ex. A, December 16, 2016 Deposition of Laura Ann Misko 15:18-16:10.) Plaintiff and her husband were not getting gas. They were going into the store of the Speedway to get coffee and they parked just two spaces to the left of the front door entrance into the store. (Misko Dep. 16:11-17:5.) Plaintiff testified that "it was really cold that night," and the United States Department of Commerce National Climatological Data for that evening confirms that it was indeed cold – ranging between 9 and 11 degrees between 9:00 and 11:00 p.m. (Misko Dep. 21:11-14; Def.'s Mot. Ex. D, Quality Controlled Local Climatological Data, Hourly Observations Table, Ann Arbor, MI.)

Plaintiff testified that as she was exiting the passenger side of the vehicle to follow her husband into the Speedway, she "just immediately flipped up into the air," without even getting into a full standing position. (Misko Dep. 17:17-18:14.)

Plaintiff testified that as soon as she planted her right leg outside the car to stand up, "[t]he pressure from the right leg just put me into the air and landed on the left heel kind of at an angle and that was it. . . . So I never really even got a couple steps off." (Misko Dep. 22:21-23:6.) The area where she placed her right foot to get out of the car "appeared like blacktop" to her but, after she fell, she knew it was ice:

Q: I want you to describe as much as possible what you fell on. Do you know, was it ice?

A: Yes, it was a large area of ice, maybe five or six foot in diameter as I discovered after I'm lying there because it was very difficult with my bottom on that ice not being able to move.

Q: And then so the color, describe the color.

A: Black.

Q: And the shape, was it a circle, was it a square, was it irregular shaped?

A: Later, I didn't know just then, it just seemed like there was a lot of ice everywhere then but maybe six to eight feet in diameter.

Q: Was it a square, a circle?

A: Big circle.

Q: And then was it just pure ice or was it slush?

A: Pure ice.

\*  \*  \*

A:     It wasn't visible, the ice, really.  It just looked like blacktop.

               *                    *                    *

Q:     Can you describe why you didn't notice that it was ice?

A:     Because it appeared to be like the blacktop.

               *                    *                    *

A:     And it was very dark but it still just appeared as the blacktop.

               *                    *                    *

A:     I could see just dark blacktop.

(Misko Dep. 23:7-23, 25:18-19, 26:12, 26:16-17, 26:21.)  Plaintiff testified that the lighting was "very dim" and appeared to come only from the front door.  (Misko Dep. 18:20-19:3.)  In fact, Plaintiff described the lighting in the parking lot where she fell as "poor."  (Misko Dep. 59:16-23.)  Plaintiff was wearing "like a little shoe boot" with a "chunk heel" about "an inch and a half high."  (Misko Dep. 19:7-12.)

Speedway staff immediately called 911 when informed that Plaintiff had fallen, and emergency vehicles arrived, Plaintiff recalls, within just a few minutes.  They placed Plaintiff in the ambulance and transported her to the University of Michigan hospital.  (Misko Dep. 31:16-32:7.)   Speedway employee Jennifer Litwa made the call to 911 and then went outside to tend to the Plaintiff, whom she recognized as a regular customer at the Speedway.  Ms. Litwa remembered that it was chilly outside.

(Def.'s Mot. Ex. B, May 23, 2017 Deposition of Jennifer Litwa 6:19-7:18.) Ms. Litwa testified that Speedway employees have a daily "ECE sheet" that describes different tasks that the employees are to strive to complete on each shift. (Litwa Dep. 9:4-10.) There are other responsibilities that, while not listed on the ECE sheet each day, employees are required to attend to immediately upon noticing them – for example a spill on the floor that they notice or that is brought to their attention or a gas spill. (Litwa Dep. 9:23-10:23, 12:3-9.) The employees strive to complete all of the items on the daily ECE sheet, but "[i]t depends on the flow of customers, customers first." (Litwa Dep. 11:9-19.) In addition to endeavoring to complete the items on the daily ECE sheet and responding to hazardous conditions like spills of which they become aware, the Speedway employees are required, once per shift, to walk around outside the building and to collect garbage, sweep around the store, and shovel snow and salt any ice accumulations when weather demands. Employees are to try to do this once every shift (of which there are three). If Plaintiff works the 3:00 - 11:00 p.m. shift and there are only going to be two employees on her shift, someone "makes time" to do the outside inspection before the evening. Ms. Litwa testified that "obviously if you see any ice or snow on the sidewalk you salt it or shovel the walk." (Litwa Dep. 12:14-13:18, 21:5-22, 39:3-40:15.)

On the night of Plaintiff's slip and fall, Ms. Litwa did the outdoor inspection at 6:00 p.m. because she knew there would only be two employees on duty for the night shift and she wanted to get it done before that shift started. Plaintiff changed the trash bags, and made sure the windshield-cleaning buckets were full of fluid. Her outside chores required her to walk directly past the parking spots in front of the store in order to get to the dumpsters in the back of the store. There had been no precipitation that day and Ms. Litwa testified that there was nothing on the parking lot surface in front of the store where Plaintiff fell – no liquid and no ice – and if there was she would have salted it. (Litwa Dep. 13:19-15:7.) Ms. Litwa testified that the lighting outside the store was "very good" – they have a lighting company that they call to come and change lights immediately when they go out. The lights are up under a canopy that goes around the building and they light up "to half way past the parking spaces." (Litwa Dep. 16:9-21, 17:16-24.)

Ms. Litwa did not see the Plaintiff fall but immediately grabbed the phone to call EMS and walked outside with Plaintiff's husband after he informed her that his wife had fallen. Ms. Litwa was required to, and did, prepare a statement for her manager describing what occurred. Ms. Litwa reported that when she went to help Plaintiff, she noticed a frozen spot underneath the Plaintiff that looked like someone had spilled something, and that frozen patch was partially covered by Plaintiff's car

on the passenger side. (Litwa Dep. 18:18-20:17.) Ms. Litwa testified that it looked like a spill "because of the way it was out like a splat." She could not immediately tell that the "spill" was ice. (Litwa Dep. 26:18-27:19.) Ms. Litwa did not speak to Plaintiff but did go back inside the store to get a warmer coat to place over Plaintiff while they waited for the EMS. (Litwa Dep. 32:7-21.) After EMS left and the Plaintiff's vehicle was gone, Ms. Litwa salted the frozen patch and the rest of the parking lot. (Litwa Dep. 20:18-21:1.)

Officer Mark Jensen of the Northfield Township Police Department was dispatched at 9:30 p.m. to the Speedway "to assist with a slip and fall." (Def.'s Mot. Ex. C, July 18, 2017 Deposition of Mark Jensen 5:1-6, 9:13-15, 10:5-12.) Officer Jensen testified that the lighting is very good in the Speedway parking lot and he offered the following observations when he arrived at the scene:

Q:      Okay. Now when you got out of the car, there was ice on the ground by Misko's car, correct?

A:      Yes.

Q:      Where was that ice located?

A:      It was located exactly where she would have stepped out of that vehicle, or tried to step out of that vehicle right by her passenger door.

Q:      Was all of the ice right by the door, or was there some underneath the vehicle?

A:     I think there was some underneath it, and if I may elaborate?

Q:     Go ahead.

A:     It appeared to me as if somebody had pulled up and dumped something out of their car.

Q:     Okay. Now in your opinion, if you were to be the one getting out of the car, do you think you could have seen ice before you got out of the car?

                    *                    *                    *

A:     I would have seen it. It was a – it had an odd color to it, a creamy color.  I would have seen it.

                    *                    *                    *

Q:     Okay, and do you recall at all if the ice blended with the color of the ground?

A:     It did not really blend with the color of the asphalt.

                    *                    *                    *

Q:     And I think you described – let me be sure – yeah, a creamy colored substance. Is that what you said?

A:     Yeah. If I remember correctly, it was almost like – like someone had spilled a coffee, a large amount of coffee or something like that.

(Jensen Dep. 14:21-15:12, 15:18-19, 15:24-16:1, 19:21-25.)  Officer Jensen made

these same observations in his written report:

8

Upon my arrival I saw Northfield Fire Department personnel treating a female subject who was laying on her back next to her Ford Fusion. The subject was in obvious pain and was complaining of an injury to her left leg. The subject on the ground was identified as Laura Misko and her husband, Mark Misko, was with her.

There was a large icy patch on the passenger side of the vehicle and Mark stated that Laura slipped and fell on it as she exited the vehicle. The icy patch appeared to have been from someone possibly parked in that same spot on an earlier occasion, who poured something out of their vehicle which then froze.

HVA arrived on the scene and transported Misko to the University of Michigan Hospital.

Speedway staff put a blue salt substance on the icy area as soon as Misko was moved.

(Pl.'s Resp. Ex. D, Feb. 12, 2015 Northfield Township Case Report 3.)

Officer Jensen testified that there "appeared to be no other ice present" in the parking lot and that "Speedway does a really good job about keeping their lot clear, as far as I'm concerned." (Jensen Dep. 17:20-22.) Officer Jensen told the Speedway employees to put salt down on the spot after the Plaintiff's vehicle was gone. (Jensen Dep. 15:20-23.) Officer Jensen stated that he did not know how long the icy patch had been there but, recalling how cold it was outside that night, he thought "it wouldn't take long for somebody to spill something and it to freeze like that." (Jensen Dep. 20:25-21:6.)

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact

could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

## III. ANALYSIS

Defendant makes two arguments in support of its motion for summary judgment: (1) there is no genuine issue of material fact that Defendant did not have notice, actual or constructive, of the hazardous condition created by the icy patch in its parking lot, and (2) even if it did have notice, the dangerous condition was open and obvious and therefore Defendant had no duty to warn against it. Because this is a diversity action, the Court applies Michigan law "as decided by the Michigan

Supreme Court." *Kessler v. Visteon*, 448 F.3d 326, 329-30 (6th Cir. 2006). "If the Michigan Supreme Court has not yet addressed the issue presented, we must predict how it would rule, by looking to all relevant data, including state appellate decisions." *Id.* at 330 (internal quotation marks and citation omitted). "[I]n all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Id.* (internal quotation marks and citations omitted).

## A. Premises Liability: Constructive Notice of the Dangerous Condition

"To establish a prima facie case of premises liability [under Michigan law], a plaintiff must establish that 1) the defendant owed the plaintiff a duty, 2) breach of that duty, 3) an injury proximately resulting from that breach, and 4) damages." *Hollerbach v. Target Corp.*, 443 F. App'x 936, 937-38 (6th Cir. 2011) (citing *Fultz v. Union–Commerce Assoc.*, 470 Mich. 460, 463 (2004)) (alteration added). A "premises possessor owes [a] business invitee [a] duty to exercise reasonable care to protect her from [an] unreasonable risk of harm caused by [a] dangerous condition on the land." *Hollerbach*, 443 F. App'x at 938 (citing *Banks v. Exxon Mobil Corp.*, 477 Mich. 983, 725 N.W.2d 455 (2007)) (alterations added). "A premises owner's duty to an invitee 'arises when the defendant has actual or constructive notice of the

13

condition.'" *Hollerbach*, 443 F. App'x at 938 (quoting *Banks*, 477 Mich. at 983 (2007)). There is no claim of actual notice here.

Constructive notice will be found where the unsafe condition "is of such a character or *has existed a sufficient length of time that [the store owner] should have had knowledge of it*." *Clark v. Kmart Corp*., 465 Mich. 416, 419 (2001) (emphasis in original, alteration added) (internal quotation marks and citation omitted). In summary,

> constructive notice may arise not only from the passage of time itself, but also from the type of condition involved, or from a combination of the two elements. Generally, the question of whether a defect has existed a sufficient length of time and under circumstances that the defendant is deemed to have notice is a question of fact, and not a question of law.

*Banks*, 477 Mich. at 983-84. "'The mere existence of a defect or danger is not enough to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it.'" *Goldsmith v. Cody*, 351 Mich. 380, 388 (1958) (quoting Prosser on Torts (2d Ed.), 459).

For a constructive notice claim to survive summary judgment there must be sufficient "evidence [to] permit a jury to find that the dangerous condition was present long enough that the defendant should have known of it." *Clark*, 465 Mich. at 419. "Where the defect was of such a nature as to warrant the conclusion that it had existed

an appreciable time, we have held the question of constructive notice to be one for the jury." *Goldsmith*, 351 Mich. at 388. On the issue of what constitutes "an appreciable amount of time," courts have concluded that varying amounts of time, depending on the circumstances, will serve as a basis to charge the premises owner with constructive notice. *See, e.g., Whitmore v. Sears, Roebuck & Co.*, 89 Mich. App. 3, 10 (1979) (absent evidence from which a reasonable inference, as opposed to mere conjecture, could be drawn that the substance had been on the parking lot ground for some time, such as testimony that several cars had driven through the spot, no reasonable inference could be drawn that Sears should have known of its presence); *Clark*, 465 Mich. at 419 (evidence that suggested that grapes had been on a grocery store floor for at least an hour was sufficient for the jury to find that the dangerous condition that led to the injury existed for a sufficient amount of time that defendant should have known of its existence).

The Sixth Circuit has summarized the parameters of this "constructive notice" theory as follows:

> Under Michigan law, shopkeepers have a duty to maintain reasonably safe premises. *Clark v. Kmart Corp.*, 465 Mich. 416, 634 N.W.2d 347, 348 (2001). A shopkeeper is negligent and thus liable for injury resulting from an unsafe condition if he: (1) actively caused the hazard, (2) knew about the hazard, or (3) should have known about the hazard. *Id.* at 348–49. Under this third theory of liability, a shopkeeper can be charged with constructive notice if the unsafe condition "is of such a character or

has existed a sufficient length of time that he should have had knowledge of it." *Id.* at 349. A plaintiff can use circumstantial evidence to establish negligence, as long as the inferences drawn from the evidence are reasonable and constitute more than mere speculation or conjecture. *Whitmore v. Sears, Roebuck & Co.*, 89 Mich. App. 3, 279 N.W.2d 318, 321 (1979).

*Gonzales v. Target Corp.*, 622 F. App'x 517, 518 (6th Cir. 2015). "There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only." *Kaminski v. Grand Trunk Western R. Co.*, 347 Mich. 417, 422 (1956). "A plaintiff may not simply present one theory of the circumstances that led to her accident if she cannot eliminate other theories sufficiently to take the case out of the realm of conjecture." *Guthre v. Lowe's Home Centers, Inc.*, 204 F. App'x 524, 527 (6th Cir. 2006) (internal quotation marks and citation omitted). A "jury [cannot be] left to speculate as to when a spill occurred to determine whether defendant's employees had constructive notice." *Id.* (quoting *Hernandez v. Kmart Corp.*, No. 235818, 2004 WL 1620853 (Mich. Ct. App. July 20, 2004)). Thus, while "'[n]otice may be inferred from evidence that the unsafe condition has existed for a length of time sufficient to have enabled a reasonably careful storekeeper to discover it[,] [w]here there is no evidence to show that the condition had existed for a considerable time, [] a directed verdict in favor of the [defendant] is proper." *Daniel v. Target*

*Corp.*, No. 12-10170, 2013 WL 12123744, at *2 (E.D. Mich. March 20, 2013) (quoting *Whitmore*, 279 N.W.2d at 321) (final alteration in original). "'[A]lthough constructive notice of a hazardous condition can be supported by reasonable inferences drawn from the evidence, such inferences must amount to more than mere speculation or conjecture.'" *Id*. (quoting *Stephens v. Kroger Co.*, No. 232135, 2002 WL 1999761, at *1 (Mich. Ct. App. 2002)).

Here, as a threshold matter, Plaintiff errs by repeatedly misrepresenting the record. The following is an example of Plaintiff's misstatement of Ms. Litwa's testimony on an important point:

> It is important to note that Litwa testified that Defendant has a policy that employees are required to clean up spills right away (Litwa Dep. at 10), including, but not limited to a spill in the parking lot (*Id*. at 12), and although it is a requirement, they may not be able to get to it during a shift (*Id*. at 12).

(ECF No. 24, Pl.'s Resp. 14.) First of all, Plaintiff's failure to cite the relevant lines of the Litwa deposition that allegedly support these statements makes it of course impossible to pinpoint the testimony on which Plaintiff relies for these assertions. But a fair reading of the entirety of Ms. Litwa's deposition at the cited pages, much of which is quoted by the Court *supra*, reveals the falsity of this assertion. Ms. Litwa clearly testified that if a spill, either in the store or the parking lot, is brought to an employee's attention, either through that employee's own observation or through a

third party such as a customer, the employee is to *immediately* attend to and clean up that spill. (Litwa Dep. 10:2-23.)  In addition to the duty to *immediately* clean up any spill of which they are aware or which is brought to their attention, employees have a responsibility to walk around and inspect the store and collect the trash at least once during each of three eight-hour shifts:

> Q:  Okay. Now other than being notified by customers are you required to do any inspections like walk around the outside of the store or the inside?
>
> A:  We collect trash from the outside once per shift and make sure that there is no garbage in the lot, sweep around the store, shovel around the store.  Different weather obviously.
>
> Q:  So the employees maintain the store.
>
> A:  That is the requirement once per shift and we try to get it every three shifts.  If we can't get to a task all at once it's not mandatory it's a guideline.

(Litwa Dep. 12:14-25.)  Counsel's own questioning acknowledged that notification of a spill by a customer – which required immediate attention – was in a different category than routine walk around inspections which are to occur once per shift.  Yet Plaintiff's response brief conflates the two to suggest that the "guideline" of the walk around/trash pull also applied in the context of a known spill.  This conclusion is wholly unsupported by the record evidence.  No reasonable juror could conclude from Ms. Litwa's testimony that the obligation of Speedway employees to *immediately*

clean up a spill in the store or parking lot of which they become aware is anything other than mandatory. Nothing in Ms. Litwa's testimony suggests that a Speedway employee is free to disregard notice of a spill if the store is too busy or there are too many customers. What an employee may sometimes forego based upon customer flow, according to Ms. Litwa, is the once-per-shift exterior walk-around and trash pull. That is supposed to occur once during each eight-hour shift but Ms. Litwa testified that sometimes it occurs less frequently based on customer flow and staffing. But in this case, there is no dispute that Ms. Litwa did perform the exterior inspection and trash pull at 6:00 p.m. on the evening of Plaintiff's fall, just before Ms. Litwa's shift began and three and a half hours before Plaintiff pulled up and encountered the frozen patch. And, as discussed *infra*, Ms. Litwa expressly testified that there was no ice in the parking area where Plaintiff fell when Ms. Litwa performed her 6:00 p.m. inspection.[2]

Plaintiff's theory of constructive notice appears to be that the frozen icy patch on which Plaintiff fell resulted from a puddle of water that "must have formed at least a [] prior to the day of the incident." (Pl.'s Resp. 13) (alteration added to indicate a

---

[2] Equally inappropriate is Plaintiff's repeated unfounded suggestion that Speedway "instruct[ed] its employees to abdicate their duties to maintain the safety of the premises when an opportunity to bolster profits presented itself." (Pl.'s Resp. 16.) There is no evidence in the record of such an instruction from Speedway to its employees.

missing word in Plaintiff's brief). Therefore, Plaintiff reasons, the icy patch on which Plaintiff fell must have been present when Ms. Litwa did her 6:00 p.m. inspection but Ms. Litwa failed to detect the hazard due to her negligent inspection. (ECF No. 27, Pl.'s Supp. Br. at 6, PgID 390.) Therefore, Plaintiff reasons, Defendant should have known of the dangerous condition.

There is, however, no evidence in the record on which a reasonable juror could rely to infer the conclusion Plaintiff suggests without engaging in pure speculation and conjecture, and a "jury [cannot be] left to speculate as to when a spill occurred to determine whether defendant's employees had constructive notice." *Guthre*, 204 F. App'x at 527. Indeed even Plaintiff, in her response brief, did not "fill in the blank" as to how long the icy patch may have existed before Plaintiff arrived and slipped – and neither could a jury. In support of her theory of constructive notice, and in an effort to rebut the alternative theory suggested by Ms. Litwa and Officer Jensen that the icy patch was created by a prior patron's spilling a drink out of their car at some time after Ms. Litwa's 6:00 p.m. inspection, Plaintiff submits a random collection of pages from unauthenticated sources discussing the density of water compared to ice and suggesting that the volume of water that would be necessary to cover a five-foot wide circular area would far exceed the amount that a patron could spill from a drink. (Pl.'s Resp. 12-13, Exs. L, M.) Importantly, these are not matters subject to judicial

notice and Plaintiff submits no expert affidavit or testimony that authenticates these materials, substantiates their acceptance in the scientific community, or explains their relation to the facts of this case.  These materials are inadmissible snippets from unauthenticated sources unsupported by any expert testimony that might explain their scientific meaning and relevance to a jury.  Plaintiff's unsupported suggestion about the volume of fluid that must have been present on the parking lot surface and her equally unsupported conclusion that the icy patch must have been caused by a sizeable "puddle" of unknown origin that existed and froze at some undetermined previous point in time is simply conjecture, on a subject that lies well beyond the ken of a layperson, unsupported by any expert testimony.  *See, e.g., McCune v. Meijer, Inc.*, 156 Mich. App. 561, 562 (1986) (rejecting plaintiff's "evaporation theory [that] was completely unsupported by any expert testimony, either by deposition or affidavit, and thus amount[ed] to no more than sheer speculation and conjecture"); *Coulter v. Michigan First Credit Union*, No. 257881, 2006 WL 664226, at *2 (Mich. Ct. App. March 16, 2006) (quoting *McCune* and rejecting as purely speculative plaintiff's theory regarding when an ice patch formed "that was completely unsupported by any expert testimony, either by deposition or affidavit, and thus amount[ed] to no more than sheer speculation and conjecture"); *Leske v. Warren Dental Associates, P.C.*, No. 214078, 2000 WL 33399787, at *3 (Mich. Ct. App. Dec. 1, 2000) (citing *McCune* and

holding that "mere conjecture cannot satisfy a plaintiff's burden of coming forward with evidentiary proof to establish that a genuine issue of material fact exists concerning whether a landowner knew or should have known of an unsafe condition on its premises").

Thus, as to the issue of how long the icy patch was present on the parking lot surface, the "evidence" consists of: (1) Ms. Litwa's affirmative eyewitness testimony that no liquid or ice was present when she did a visual inspection three and a half hours before Plaintiff's fall; (2) the testimony of both Ms. Litwa and Officer Jensen that it "appeared" that a customer had spilled or dumped a liquid on the parking lot surface, which then froze on the frigid February night before Plaintiff pulled up and stepped out of her car; and (3) Plaintiff's conjecture that a "puddle" of unknown origin "must have formed" and "must have frozen" some time prior to Ms. Litwa's 6:00 p.m. inspection and was missed by Ms. Litwa on her 6:00 p.m. inspection. Though perhaps equally plausible, these explanations as to how the icy patch came to be are based on pure conjecture on this record. Plaintiff, who bears the burden in response to Defendant's motion to establish the existence of a genuine issue of material fact as to constructive notice, has failed to proffer any admissible evidence from which a jury could reasonably find her theory more likely than another and therefore no evidence on which a jury could infer constructive notice based upon anything but speculation

and conjecture. There is no "evidence of evidentiary quality" in the record on which a jury could determine how long it would take an unknown substance, of an unknown origin, to freeze on a parking lot surface on an evening when the temperature hovered between 9 and 11 degrees, and therefore no way for a jury to determine, beyond conjecture and speculation, how long the icy patch was present on the Defendant's premises. Plaintiff, therefore, has not met her burden on summary judgment to establish that there exists a genuine issue of material fact as to the issue of constructive notice. "There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only." *Kaminski*, 347 Mich. at 422. Here, the evidence does not favor any proffered theory as more likely than another and a jury necessarily would have to speculate about many facts in order to impose constructive notice on Speedway, including: (1) the nature of the mystery liquid that formed an icy patch on the Speedway parking lot; (2) whether it occurred naturally or through the conduct of a third person; (3) how much liquid was present; (4) whether the liquid was hot or cold or how this might have affected the time it took the liquid to freeze and create a dangerous condition; (5) when the liquid first appeared; and (6) how long the mystery liquid took to freeze. Conclusions as to all of these inquiries, and more, would be necessary to impose constructive notice on

Speedway under these facts, yet there is absolutely no evidence in the record on which a jury could reasonably rely to determine any of these matters beyond pure conjecture. The "jury [cannot be] left to speculate as to when a spill occurred to determine whether defendant's employees had constructive notice." *Guthre*, 204 F. App'x at 527.

Because there is no evidence in this record on which a jury could reasonably infer how long the icy patch was present on Defendant's premises prior to Plaintiff's fall, the Court finds *Young v. Walton Oil*, No. 333794, 2018 WL 734765 (Mich. Ct. App. Feb. 6, 2018), which the Court asked the parties to address in supplemental briefing, distinguishable. In *Walton Oil*, the plaintiff slipped and fell on ice while walking near the gas pumps at the defendant's gas station on a cold February Michigan winter night. The plaintiff conceded that the area where he fell was well lit and entirely cleared of snow and that he did not see any ice. *Id*. at *1. The on-duty manager testified that earlier in the day he inspected the area near the pumps where plaintiff fell and there was "no ice" anywhere. *Id*. Another manager who watched a store video that depicted plaintiff's fall testified that the parking lot was "pretty clean" and that there was no ice. The trial court dismissed the action, finding that neither manager had seen the ice and that there was no evidence regarding the length of time the ice had been on the ground, and therefore no basis for a reasonable jury to find

constructive notice.  *Id*.  The trial court also found that the condition was open and obvious and based upon the surrounding wintry conditions that day, which should have alerted patrons to expect icy conditions.  *Id*.

The Michigan Court of Appeals reversed, finding a genuine issue of material fact as to both open and obviousness and constructive notice.  As to the issue of constructive notice, the Court reasoned:

> The employees of Walton Oil knew that ice sometimes formed on the surface of the gas station. They kept salt at the ready for deployment in preventing slippery patches. One employee specifically acknowledged that ice sometimes develops in pavement "cracks." These realities of a gas station in winter would reasonably support a need for regular inspections of the premises. Further, a Walton Oil employee testified that an inspection occurred several hours before Young's fall.
>
> Viewed in the light most favorable to Young, the ice on which he fell was present at 3:00 p.m. when Al Asadi claims to have inspected the premises. We base this conclusion on the fact that nothing changed, weather-wise, throughout that afternoon and evening. The temperature remained the same: well below freezing. There was no snow. No evidence supports that something happened that would have suddenly caused a patch of ice to form. The reasonable inference is that if Al Asadi actually inspected the premises at 3:00 p.m., he did so negligently. And although the ice may have been difficult to see, Al Asadi's duty included looking for hazards, not merely casually inspecting the premises. Price v Kroger Co of Mich, 284 Mich App 496, 500; 773 NW2d 739 (2009). A jury could reasonably find that Al Asadi should have seen the ice, especially since Krayem found it the next day when he inspected the premises.

*Walton Oil*, 2018 WL 734765, at *3.

Two significant facts distinguish *Walton Oil* from this case and dictate a different result here: (1) there was evidence presented in *Walton Oil* that employees had previously encountered the build up of ice in the cracks of the pavement near the gas pumps in the winter months, the very condition that caused the plaintiff's fall in that case; and (2) there was evidence in *Walton Oil* supporting a reasonable inference that the condition *was* present when the employee conducted an inspection at 3:00 p.m. some hours prior to the plaintiff's fall and there was *no evidence* to support the inference that something happened that would suddenly have caused a patch of ice to form after that inspection. These facts led the Michigan Court of Appeals in *Walton Oil* to conclude that more regular inspections of the parking lot may have been indicated in that case and that defendant's "casual inspection," that failed to observe the dangerous condition, did not meet the duty imposed under the circumstances to detect hazardous conditions. 2018 WL 734765, at *3.

In this case, there is (1) no evidence in the record on which a reasonable juror could conclude that employees of the Defendant had previously encountered random isolated frozen patches of ice in the area of the parking lot where patrons parked to enter the store; and (2) no evidence in the record on which a juror could reasonably infer that the icy patch was present when Ms. Litwa performed her 6:00 p.m. inspection because Plaintiff's theory that a puddle must have formed and frozen

sometime prior to Ms. Litwa's 6:00 p.m. inspection is simply one of "two or more plausible explanations" as to how the icy patch was formed and how long it was present on the Defendant's premises and the evidence "is without selective application to any one of them." *Kaminski*, 347 Mich. at 422.

"An invitor's general knowledge that a condition can materialize is not sufficient to create constructive knowledge of the existence of a particular condition at a specific time." *Herwig-Tucker v. Detroit Entertainment, LLC*, No. 227382, 2004 WL 550736, at *1 (Mich. Ct. App. March 18, 2004) (citing *Winfrey v. S S Kresge Co.*, 6 Mich. App 504, 509-510; 149 NW2d 470 (1967)). Here "Plaintiff presented no evidence from which a reasonable jury could infer without engaging in impermissible speculation that the [icy patch] had been on the [parking lot surface] for a sufficiently lengthy period of time that, but for the lack of a more aggressive inspection schedule, it would have been discovered and removed prior to her [fall]." *Id.* As the Court observed in *Walton Oil*, a premises owner's "knowledge of the 'actual conditions' of the premises demands adequate inspection to discover latent dangers." However, there is no evidence in this case that the inspection protocol followed by Defendant's employees fell below any standard of care imposed on Defendant under the circumstances of this case. Michigan courts recognize that "[t]he duty to inspect one's premises to ensure that the premises are safe for invitees is inextricably linked to the

concept of constructive notice." *Thompson v. Gibson*, No. 333755, 2017 WL 3397691, at *2 (Mich. Ct. App. Aug. 8, 2017) (quotation marks and citation omitted). Here, the facts surrounding the issue of constructive notice, discussed at length *supra*, give no basis for imposing a greater duty of inspection on this Defendant than it employed under the circumstances. In any event, as the Michigan Supreme Court has expressly held, it is not Defendant's burden on summary judgment "to present evidence of a routine or reasonable inspection under the circumstances to prove a premises owner's lack of constructive notice of dangerous condition on its property. . . . Rather . . . defendant [can] establish its entitlement to summary disposition by demonstrating that plaintiff failed to present evidence of notice." *Lowrey v. LMPS & LMPJ, Inc.*, 500 Mich. 1, 10 (2016). *See also Lloyd-Lee v. Westborn Fruit Market, Inc.*, No. 329657, 2017 WL 187981, at *4 (Mich. Ct. App. Jan. 17, 2017) (noting that in light of *Lowrey,* defendant was not "required to present evidence of its inspection regime or what constituted a reasonable inspection under the circumstances [and] [i]nstead [] was entitled to summary disposition because . . . plaintiff failed to set forth sufficient evidence to establish that defendant had actual or constructive notice of the [dangerous condition]"); *Harris v. CW Financial Services LLC*, No. 329868, 2017 WL 104572, at * (Mich. Ct. App. Jan. 10, 2017) (observing that "in light of *Lowrey*, plaintiff's contention that defendants were required, in asserting that they did not have

constructive notice, to provide proof that a reasonable inspection was conducted, or if conducted would not have revealed the alleged dangerous condition, is without merit"). Here, because Plaintiff has failed "to demonstrate that defendant knew about the [icy patch] or should have known of it because of its character or the duration of its presence," she has failed to demonstrate constructive notice and defendant is entitled to summary judgment. *Lowrey*, 500 Mich. at 11.[3]

## B.    Open and Obvious

"In general, a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v. Ameritech Corp., Inc.*, 464 Mich. 512, 516 (2001). A premises owner, however, owes no duty to protect a business invitee from or to warn of "open and obvious" dangers:

> [I]f the particular activity or condition creates a risk of harm *only* because the invitee does not discover the condition or realize its danger, then the open and obvious doctrine will cut off liability if the invitee

---

[3] Indeed in this case it would be impossible for a jury to determine what might have been a more "reasonable" inspection regime given the absence of evidence establishing when the liquid froze. Would an "every hour" regime have disclosed the condition? Would an "every half hour" regime have disclosed the condition? How about an "every ten-minute" regime? Because the jury would have no evidence on which to determine how quickly the mystery liquid would have turned to an icy patch on a winter Michigan evening when temperatures hovered between 9 and 11 degrees, it would be impossible for them to decide what inspection time interval would have revealed the dangerous condition.

should have discovered the conditions and realized its danger. On the other hand, if the risk of harm remains unreasonable, despite its obviousness or despite knowledge of it by the invitee, then the circumstances may be such that the invitor is required to undertake reasonable precautions.

*Lugo*, 464 Mich. at 516-17 (quoting *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 611 (1995) (emphasis in original). Defendant argues that the icy patch on which Plaintiff slipped and fell was open and obvious.

The Court concludes that Plaintiff has failed to establish a genuine issue of material fact that Defendant had constructive notice of the icy patch, necessitating entry of summary judgment in Defendant's favor. Accordingly, the Court need not address Defendant's alternative argument that the icy patch was an open and obvious condition. *See, e.g. Coulter*, 2006 WL 664226, at *3 (finding the defendant's argument that the condition was open and obvious moot in light of the court's resolution of the notice issue); *Leske*, 2000 WL 33399787, at *3 (finding it unnecessary to address defendant's alternative argument that the condition was open and obvious given its finding that summary disposition was appropriate based on lack of notice).

## IV. CONCLUSION

Because Plaintiff has failed to establish that Defendant had notice of the dangerous condition, she has failed to establish a *prima facie* case of premises

liability. Accordingly, the Court GRANTS Defendant's motion for summary judgment and DISMISSES Plaintiff's Complaint WITH PREJUDICE.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: May 29, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 29, 2018.


s/Deborah Tofil
Case Manager